## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHICAGO H&S HOTEL PROPERTY, | ) | |
| L.L.C., | ) | Case No. 07-20088 |
| | ) | |
| | ) | Honorable Eugene R. Wedoff |
| Debtor. | ) | |
| | ) | **Motion Date: Wednesday, January 29, 2008** |
| | ) | **Motion Time: 10:00 a.m.** |
| | ) | |
| | ) | |

### NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on January 29, 2007 at 10:00 a.m. or as soon thereafter as counsel may be heard, I shall appear before the Honorable Eugene R. Wedoff. Doyle, U.S. Bankruptcy Judge, in Courtroom 744 or such other room usually occupied by him as a Courtroom in the U.S. Courthouse, 219 S. Dearborn St., Chicago, IL 60604, or in his absence, before such other Judge who may be sitting in his place and stead and hearing bankruptcy motions, and shall then and there present the **JOINT MOTION FOR RELIEF FROM STAY**, a copy of which is attached and herewith served upon you, and shall pray for the entry of an order in conformity with the prayer of said pleadings.

**AT WHICH TIME AND PLACE** you may appear if you so see fit.

| | |
|---|---|
| January 22, 2008 | Respectfully submitted, |
| | |
| CHICAGO TITLE & TRUST COMPANY | CORDES & CO. |
| | |
| By:  /s/ Peter A. Siddiqui | By:  /s/  Mark E. Leipold |
| One of Its Attorneys | One of Its attorneys |
| | |
| Timothy J. Patenode (ARDC # 06181232) | Christopher J. Harvey (ARDC # 1263315) |
| Peter A. Siddiqui (ARDC # 06278445) | Mark E. Leipold (ARDC # 6194124) |
| Katten Muchin Rosenman LLP | Gould & Ratner LLP |
| 525 West Monroe Street | 222 North LaSalle Street, 8th Floor |
| Chicago, IL 60661 | Chicago, IL 60601 |
| (312) 902-5200 | (312) 899-1600 |
| (312) 577-4628 (fax) | (312) 236-3241 (fax) |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHICAGO H&S HOTEL PROPERTY, | ) |
| L.L.C., | ) Case No. 07-20088 |
| | ) |
| | ) Honorable Eugene R. Wedoff |
| Debtor. | ) |
| | ) |
| | ) **Motion Date:  Wednesday, January 29, 2008** |
| | ) **Motion Time:  10:00 a.m.** |
| | ) |
| | ) |

### JOINT MOTION FOR RELIEF FROM STAY

Chicago Title & Trust Company ("CT&T") and Cordes & Company, LLC (the

"Receiver") hereby jointly move this Court to enter an Order modifying the automatic

stay to allow the parties to name Chicago H&S Hotel Property, L.L.C. (the "Debtor") as a

nominal party to a counterclaim in the interpleader to be filed in the lawsuit entitled

*Cordes & Company, LLC. v. Chicago H&S Hotel Property, et al.*, pending before Hon.

Ruben Castillo in the United States District Court for the Northern District of Illinois,

Case No. 07-C-3526 (the "Action").  The Debtor has no legal or equitable interest in the

property that is to be interpled and the interpleader proceeding will result in the reduction

or elimination of substantial claims against the Debtor.  In support of their motion, CT&T

and the Receiver assert as follows.

### Jurisdiction and Venue

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper in this Court pursuant 28 U.S.C. §§ 1408 and 1409.  This

matter is a core proceeding under 28 U.S.C. § 157(b)(2)(G) and (O).

## Background

2.     On October 29, 2007, the Debtor filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.     The Debtor's principal asset is certain hotel property located at 71 East Wacker Drive in Chicago, Illinois ("Hotel 71").  The Receiver alleges that prior to Debtor's bankruptcy filing, the Debtor intended to sell hotel condominium units in the property.

4.     Prior to the Debtor's bankruptcy filing, the Receiver commenced the Action against, among others, CT&T and the Debtor.  At issue in the Action, among other things, is the distribution of certain funds in an escrow account held by CT&T, which has been identified as CT&T Escrow Account No. 25094527 (the "Escrow Account").  The Escrow Account is subject to a certain Escrow Agreement, a copy of which is attached as Exhibit A.

5.     The Receiver was appointed by the Hennepin County District Court in Hennepin County, Minnesota to recover the property and assets of National Real Estate Assignments LLC ("NREA"), among other entities subject to the receivership.  NREA and the other entities were involved in investment schemes that caused certain financial losses for various investors (the "Investors").  Copies of orders of appointment are attached as exhibits to the Receiver's Complaint in the Action.

6.     The alleged hotel condominium conversion project at Hotel 71 was actively promoted by NREA and the other entities subject to the receivership, and those entities obtained millions of dollars from certain Investors for, among other purposes,

reservation deposits and down payments to purchase hotel condominium units in the Hotel 71 project. In September and October 2005, NREA made three lump-sum wire transfers totaling $2,559,339 into the Escrow Account (together with interest thereon, the "Escrow Funds"). (Copies of the wire transfer notifications are attached as Exhibit B.) However, prior to the date when any of the unit sale closings were scheduled to take place, Debtor abandoned the concept of a hotel condominium, never filed any condominium declarations and no closings of any unit ever occurred. Furthermore, the purchase contracts that Debtor has evidenced required a closing by June 30, 2007, unless extended to a date in all events no later than three months after June 30, 2007. (An example of such a purchase contract is attached as Exhibit C.) Movants have no evidence of any such extension, and, in any event, the outside closing date passed pre-petition. Prior to the Bankruptcy Case the Debtor has admitted in the Action that it no longer has a right to recover any of the Escrow Funds. (Ex. D at 8.)

7.    NREA transferred the Escrow Funds to CT&T without identifying any specific Investors from whom the funds may have been received. Debtor has indicated that the Escrow Funds relate to approximately 42 specific contracts for the purchase of hotel condominium units. But the amount of the Escrow Funds does not correspond to the total deposits made on the 42 contracts; and the Receiver has indicated that there are 98 contracts signed by Investors who claim to have given money to NREA or the other receivership entities for the purpose of purchasing hotel condominium units in the Hotel 71 project.

8.    Upon the filing of the Debtor's bankruptcy case, the district court dismissed the Debtor from the Action, without prejudice. CT&T intends to file a

counterclaim in interpleader that would name Debtor, the Investors who are parties to the

98 contracts and others, so as to cause the Escrow Funds to be paid appropriately out of the

Escrow Account to the Receiver for adjudication in the state court in Minnesota. The

Receiver and CT&T will provide notice to the Investors. The Receiver and CT&T would

support the entry of any appropriate order discharging the Debtor from further liability to

the Receiver, CT&T and the Investors, with respect to the Escrow Account and the Escrow

Funds.

### **Relief Requested**

9.      By this motion, and pursuant to section 362(d)(1) and (d)(2) of the

Bankruptcy Code, CT&T and Receiver respectfully request this Court enter an order

modifying the automatic stay to allow the Debtor to be named a nominal party to the

Action.

**A.      *Cause Exists to Modify the Automatic Stay***

10.      Section 362(d)(1) of the Bankruptcy Code provides that the Court shall

grant relief from the automatic stay "for cause." 11 U.S.C. § 362(d)(1).

11.      There is good cause for the modifying of the stay as the joinder of the

Debtor in the Action is essential to the resolution of any interpleader in that case.

12.      The Action involves the Escrow Account held by CT&T. Debtor has no

right to receive the Escrow Funds under the purchase contracts. Although the Debtor is a

party to the escrow agreement, the Debtor does not hold either legal or equitable title to the

Escrow Funds and, consequently, the Escrow Funds are not property of the estate. *See* 11

U.S.C. § 541. The only interest of the Debtor implicated by the Action is a refund of

Escrow Funds to the parties entitled to them, who may otherwise have claims against the Debtor's estate.

13.    Cause exists to modify the stay to permit CT&T to name the Debtor as a party to its interpleader.  Naming the Debtor is required for the District Court to adjudicate the issues related to the interpled Escrow Funds, which, in turn, will result in the elimination or diminution of substantial claims asserted against the Debtor by the Investors and other parties.  Furthermore, the Debtor will not be required to expend significant, if any, resources in connection with the Action.  Consequently, the stay should be modified.

**B.**    ***The Debtor Has No Equity in the Escrow Funds.***

14.    Section 362(d)(2) of the Bankruptcy Code provides that relief from the automatic stay must be granted if the debtor: (a) has no equity in the subject property; and (b) the property is not necessary to an effective reorganization.   11 U.S.C. § 362(d)(2). Both requirements are met with respect to the Escrow Funds.

15.    First, the Debtors do not have equity, or any interest, in the Escrow Funds. Given the Debtor's inability to close the purchase contracts, and its admission in the Action that, under no circumstances, will the Escrow Funds be transferred to the Debtor, the Debtor has no interest in the Escrow Funds.

16.    Second, the Escrow Funds are not necessary to an effective reorganization as the Escrow Funds are not available to the Debtor to fund its plan or any distribution to the Debtor's creditors.   Indeed, the plan filed by the Debtor fails even to refer to the Escrow Funds, let alone assert that the Escrow Funds are required for confirmation.

**WHEREFORE,** CT&T and the Receiver request that the Court enter an order:

A.    Granting relief from the stay to permit the Debtor to be named as a party to the Action; and

B.    Granting such other and further relief as the Court deems just and proper.

January 22, 2008

Respectfully submitted,

CHICAGO TITLE & TRUST COMPANY

By:   _/s/ Peter A. Siddiqui_
        One of Its Attorneys

Timothy J. Patenode (ARDC # 06181232)
Peter A. Siddiqui (ARDC # 06278445)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200
(312) 577-4628 (fax)

CORDES & CO.

By:   _/s/    Mark E. Leipold_
        One of Its Attorneys

Christopher J. Harvey (ARDC # 1263315)
Mark E. Leipold (ARDC # 6194124)
Gould & Ratner, LLP
222 North LaSalle Street, 8th Floor
Chicago, IL 60601
(312) 899-1600
(312) 236-3241 (fax)

## CERTIFICATE OF SERVICE

I, Mark E. Leipold, certify that I caused copies of the Joint Motion for Relief from Stay, a copy of which is attached hereto, to be served upon the parties listed below via email and by the Court's CM/ECF System on the 22nd day of January 2008.

See Attached Service List

Dated:  January 22, 2008

Respectfully submitted,

/s/  Mark E. Leipold

Mark E. Leipold (ARDC No. 6194124)
GOULD & RATNER LLP
222 North LaSalle Street, Suite 800
Chicago, Illinois  60601
312.236.3003
312.236.3241 (facsimile)
mleipold@gouldratner.com

# SERVICE LIST

| | |
|---|---|
| Daniel A. Zazove<br>Jason Horwitz<br>Perkins Coie, LLP<br>131 S. Dearborn Street, 17th Floor<br>Chicago, IL 60603<br>dzazove@perkinscoie.com<br>jhorwitz@perkinscoie.com | Roman Sukley<br>Office of the U.S. Trustee, Region 11<br>227 W. Monroe Street, Suite 3350<br>Chicago, IL 60606<br>roman.l.sukely@usdoj.gov |
| Brad B. Erens<br>Mark A. Cody<br>Jones Day<br>77 W. Wacker Drive<br>Chicago, IL 60601-1692<br>bberens@jonesday.com<br>macody@jonesday.com | Gregory J. Jordan<br>Peter J. Schmidt<br>Jean Soh<br>Polsinelli Shalton Flanigan Suelthaus PC<br>Two Prudential Plaza, Suite 4525<br>Chicago, IL 60601<br>312.819.1900<br>312.819.1910 facsimile<br>gjordan@polsinelli.com<br>pschmidt@polsinelli.com |
| James E. Bird<br>Amy E. Hatch<br>Polsinelli Shalton Flanigan Suelthaus PC<br>700 West 47th Street, Suite 1000<br>Kansas City, MO 64112<br>816.753.1000<br>816.753.1536 facsimile<br>jbird@polsinelli.com<br>ahatach@polsinelli.com | |

# EXHIBIT A

09/20/2005   16:20    312-236-7516    DLAPRGC US LLP    PAGE  02/03



# CHICAGO TITLE AND TRUST COMPANY

171 NORTH CLARK, CHICAGO, ILLINOIS  60601

Refer to: LINDA TYRELL
Phone no.: 312-223-3361
Fax no.: 312-223-5888

## STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)

ESCROW TRUST NO.: 25094527    DATE: September 20, 2005

To: Chicago Title and Trust Company, Escrow Trustee:

Customer Identification:

Seller: Chicago H&S Hotel Property ( The Falor companies)

Purchaser:

Property Address: Hotel 71, 71 E. Wacker, Chicago, IL

Project Reference:

**PLEASE NOTE:**
Uncertified Checks are held for 10 Business days after date of deposit.
No funds can be disbursed before the 10 business day limit expires
To avoid the delay - use  cashier or certified checks or wire transfers

Proposed Disbursement Date:

Deposits:

1.  The sum of $ 2,000,000 and any additional deposits by            representing:
    EARNEST MONEY

### Delivery of Deposits:

The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

### Billing Instructions:

Escrow trust fee will be billed as follows:
($2.00)  1/2 TO EACH PARTY, UNLESS OTHERWISE SPECIFIED; HOWEVER IF THE FINAL DEED AND MONEY TAKES PLACE AT CHICAGO TITLE AND TRUST CO., THE JOINT ORDER ESCROW FEE WILL BE WAIVED.

The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title and Trust Company will impose an administrative maintenance fee (quarterly, semi-annually, or annually) equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed to
1/2 TO EACH PARTY; ONE YEAR FROM DATE

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. Chicago Title and Trust Company, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at Chicago Title.

STIPI 1/80 DOC    Page 1

Escrow Trust No.:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto, provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

For Seller:                                    For Purchaser:

Name:                                          Name:

By:                                            By:

Address:                                       Address:


Phone:                                         Phone:
Fax:                                           Fax:

Signature: _____             Signature: _____
                                                       on behalf of buyer
Accepted: Chicago Title and Trust Company, as Escrow Trustee    Justin Greenbaum - Secretary of Formub,

By: _____                     Date: 11/9/05
    LINDA TYRRELL

mm                              Page 2

# EXHIBIT B

# FAX

**TO:**      Wiring Department – Eagle Crest Bank

**FAX #:**   952-848-5395

**DATE:**    September 15, 2005

**FROM:**    Maureen Johnson, Operations Manager
Office: 763-412-4919

**Total number of pages including cover sheet:**   1 page

---

Notes/comments:

Please wire:  $2,000,000.00 (Two Million Dollars)

From:  National Real Estate Assignments  Acct# 15-29100410

To:  LaSalle National Bank
135 S LaSalle Street, Chicago IL  60603
ABA:  071000505

For Credit to:
Chicago Title & Trust Company, Loop
Acct #5800038704
Hotel 71/IPA 10% Deposits
Notify:
Escrow # 25094527
Escrow Officer:  Linda Tyrrell
Closing Division: D1
Phone:  312-223-3361

Thanks,
Maureen Johnson

# FAX

**TO:**      Wiring Department – Eagle Crest Bank

**FAX #:**   952-848-5395

**DATE:**    September 23, 2005

**FROM:**    Maureen Johnson, Operations Manager
            Office: 763-412-4919

**Total number of pages including cover sheet:**   1 page

---

Notes/comments:

Please wire:      $345,600.00
                  (Three hundred forty five thousand six hundred)

From:  National Real Estate Assignments  Acct# 15-29100410

To:   LaSalle National Bank
      135 S LaSalle Street, Chicago IL  60603
ABA:  071000505

For Credit to:
      Chicago Title & Trust Company, Loop
      Acct #5800038704
      Hotel 71/IPA 10% Deposits
Notify:
      Escrow # 25094527
      Escrow Officer:  Linda Tyrrell
      Closing Division: D1
      Phone:  312-223-3361

Thanks,
Maureen Johnson

# FAX

**TO:**     Wiring Department – Eagle Crest Bank

**FAX #:**   952-848-5395

**DATE:**   October 14, 2005

**FROM:**   Maureen Johnson, Operations Manager
Office: 763-412-4919

**Total number of pages including cover sheet:**  1 page

---

Notes/comments:

Please wire:    $213,739.00
(Two hundred thirteen, seven hundred thirty nine)

From:  National Real Estate Assignments  Acct# 15-29100410

To:   LaSalle National Bank
135 S LaSalle Street, Chicago, IL  60603
ABA:  071000505

For Credit to:
Chicago Title & Trust Company, Loop
Acct #5800038704
Hotel 71/IPA 10% Deposits
Notify:
Escrow #25094527
Escrow Officer:  Linda Tyrrell
Closing Division:  D1
Phone:  312-223-3361

Thanks,
Maureen Johnson

# EXHIBIT C

## 71 EAST WACKER HOTEL CONDOMINIUM PURCHASE AGREEMENT

**NAME OF PURCHASER:**

_Timothy Amstutz_          _Monica Amstutz_

**SOCIAL SECURITY NO.** _469 68 3498_     _182- 84 6725_

**HOME ADDRESS:** _2324  87 Tr. N_        **OFFICE ADDRESS:** _7201 75th Ave N._
_Brooklyn Park, MN_              _Brooklyn Park_
_55443_                    _55428_

**HOME PHONE:** _763 493 9298_       **OFFICE PHONE:** _763 315 7031_

**HOME FAX:** _____        **OFFICE FAX:** _____

**HOME E-MAIL** _tamstutz @_        **OFFICE E-MAIL:** _____
_CFaith . com_

**PURCHASER'S ATTORNEY:**

_____          **PHONE:** _____
_____          **FAX:** _____
_____          **E-MAIL:** _____

**PURCHASER'S BROKER:**

_____          **PHONE:** _____
_____          **FAX:** _____
_____          **E-MAIL:** _____

**NAME OF SELLER:** _2106_       **CHICAGO H&S HOTEL PROPERTY, LLC**

**PURCHASED UNIT:** _2806  RT3_

1.    **Purchase Price.** The total Purchase Price (defined below) for the Property (defined below) is payable as hereinafter set forth:

(a)    The total Purchase Price for the Property shall be computed as follows: _568,900_

Base Price for Purchased Unit (defined below) (the "Base Price")    $ _568,900_

FF&E (defined below)    $ _____

Total Purchase Price for Property ("Purchase Price")    $ _568,900_

(b)    The Purchase Price shall be paid as follows:

_10%_    Earnish money deposit (the "Earnest Money"), which shall equal ~~twenty percent (20%)~~ of the Base Price, payable on the date of Purchaser's execution of this Agreement:    $ _____

Less prepaid Reservation Deposit, if any:    ($ _____)

FF&E Downpayment (defined below); 20% of total FF&E payment, payable concurrently with payment of the Earnest Money:    $ _____

~CHGO2:20221572.v2

FF&E Balance (defined below); balance of total FF&E payment:    $_____

Balance of the Purchase Price (i.e., the Purchase Price less
any Earnest Money paid to Seller and less the FF&E Downpayment
and FF&E Balance previously paid to Seller); payable at Closing:    $_____

2.    <u>Purchase of Condominium Unit</u>.

(a)    Seller agrees to convey, or cause to be conveyed, to Purchaser, and Purchaser agrees to purchase from Seller, pursuant to the terms and conditions of this Purchase Agreement: (a) Unit No. _2406_ *RT 3* ("Purchased Unit") in the "71 East Wacker Hotel Condominium" (the "Condominium"); (b) the undivided percentage interest attributable to such unit as a tenant-in-common in the Common Elements (as defined in the Illinois Condominium Property Act ["Act"]) of the Condominium; (c) the Personal Property (hereinafter defined) and (d) the FF&E (hereinafter defined). The Purchased Unit and its corresponding percentage interest in the Common Elements are herein collectively referred to as the "Unit Ownership." The Unit Ownership, the Personal Property and the FF&E are herein collectively referred to as the "Property." The Condominium will be located at 71 East Wacker Drive, Chicago, Illinois within the buildings (collectively, the "Building") located thereon. The "Condominium Property" consists of the real estate legally described in Exhibit A hereto, together with improvements which may be made thereto (except as may be owned by the owners or occupants of the Commercial Units (as defined in the Condominium Declaration, which is defined below), which are initially contemplated to be a restaurant space (the "Restaurant") and certain ballroom (the "Ballroom") and meeting room (the "Meeting Rooms") spaces. The "Personal Property" means the furniture, fixtures, linens, window treatments, appliances to be installed in the Purchased Unit, if any, and other finishes, décor items and personalty more particularly described on the schedule of Personal Property, Finishes and FF&E attached as Exhibit B hereto. Exhibit B also contains a schedule of all other finishes to be included in the Purchased Unit (collectively, the "Finishes") and a schedule of the FF&E to be included in the Purchased Unit.

(b)    When the Earnest Money payment is made, Seller shall deposit said funds in an interest bearing escrow account. Earnest Money so paid and deposited shall be held for the mutual benefit of Seller and Purchaser and retained or disbursed in accordance with the terms and provisions of this Purchase Agreement. Purchaser shall be entitled to all interest earned on the Earnest Money from the date of deposit to the Closing Date (as defined in and provided for in Paragraph 5 hereof); provided, however, no interest shall be payable if the Closing Date falls within 45 days after execution of this Purchase Agreement.

(c)    As more particularly described in Section 13-17-020(I) of the Property Report (defined below), Purchaser is obligated to pay to Seller as and when provided below the purchase price for all furniture, fixtures, window treatments and all other furnishings, décor and accents (collectively, the "FF&E") for the Purchased Unit, which FF&E will be selected by Seller in its sole and absolute discretion and which will include, without limitation, furniture, décor items, towels, linens, color television, DVD player, clock, radio, drapes and other window treatments and decorative accessories. Pursuant to and in accordance with the Condominium Declaration (defined below), Purchaser will not be permitted to vary, add to, remove or change the FF&E in the Purchased Unit. Purchaser will be obligated to pay to Seller twenty percent (20%) of the purchase price for the FF&E (the "FF&E Downpayment") upon execution of this Agreement, and Purchaser shall pay the balance of the purchase price for the FF&E (the "FF&E Balance") to Seller on the Closing Date. The FF&E items purchased from Seller will be installed in the Purchased Unit on or before the Closing Date. The FF&E Downpayment and FF&E Balance shall be held by the Seller and may be applied by the Seller at any time, and without notice to Purchaser, in order to pay for the work and materials included in the FF&E installation. If Purchaser becomes entitled to rescission of this Agreement for any reason whatsoever (other than Purchaser default hereunder), Purchaser will receive a full refund of any portion of the FF&E Downpayment and the FF&E Balance paid to Seller by Purchaser.

3.    <u>Finishes and Warranty</u>. Seller has improved or will improve the Purchased Unit substantially in accordance with (i) the floor plan for the Purchased Unit ("Floor Plans"); and (ii) the Finishes; provided, however, that the Floor Plans, Personal Property and the Finishes may change from time to time in order to accommodate Seller's changes to the Condominium project and further provided that the boundaries of the Purchased Unit shall be as finally depicted in the plat of survey (the "Plat") attached to the Condominium Declaration (defined in Paragraph 4(a) hereof).

(a)    Seller is hereby granted the right to make changes in the Floor Plans, Personal Property, Finishes and FF&E for the Purchased Unit on the terms set forth herein. No changes shall be made in the room dimensions of the Purchased Unit shown on the Plans and Specifications without the consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), except that Seller may change the room dimensions without

Purchaser's consent if (i) such change will not result in a square footage reduction exceeding five percent (5%) of the gross square footage of the Purchased Unit or (ii) Seller deems it necessary to accommodate structural or mechanical elements of the Building or to comply with local codes or ordinances, statutes, regulations or requirements of inspecting governmental agencies, provided that such changes contemplated in this subparagraph (ii) made without Purchaser's consent do not materially adversely affect the rights of the Purchaser hereunder or the value of the Purchased Unit. Seller may substitute materials, appliances, if any, equipment, Personal Property, Finishes, FF&E or other items of an equal or better quality, in Seller's reasonable judgment, for any materials, appliances, if any, equipment, Personal Property, Finishes, FF&E or other items provided for in the Floor Plans and schedule of Personal Property, Finishes and FF&E on Exhibit B hereto, but the Purchase Price will not be increased by reason of any such substitutions made by Seller. Purchaser hereby authorizes Seller to make any such substitution without further consent from Purchaser.

(b)      In order to control the overall design and appearance of the Condominium, Seller reserves the right to select the exterior colors and finishing materials for all of the Common Elements and the Shared Facilities Unit (as defined in the Property Report, which is defined below) as well as all colors and finishing materials within the Purchased Unit. If model units are available for Purchaser's inspection, Purchaser hereby acknowledges and agrees that the appliances, decorative fixtures, trim, furnishings, decorative floor and wall coverings and all personal property and FF&E located in any such model units are for display purposes only and are not included in the Purchased Unit unless specifically set forth herein to the contrary. Purchaser acknowledges and understands that colors, finishes, styles and designs of any included Personal Property or of the Purchased Unit may differ from unit to unit and may be different from those colors, finishes, styles and designs in the model units.

(c)      PURCHASER ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PROPERTY "AS-IS", WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BY WAY OF ILLUSTRATION AND NOT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, HABITABILITY, WORKMANSHIP OR FITNESS FOR A PARTICULAR PURPOSE. SELLER NEITHER ASSUMES NOR AUTHORIZES ANY PERSON TO ASSUME FOR SELLER ANY OTHER LIABILITY IN CONNECTION WITH THE SALE OR USE OF THE PROPERTY (INCLUDING THE PURCHASED UNIT) AND THERE ARE NO AGREEMENTS OR WARRANTIES, EITHER ORAL OR WRITTEN, COLLATERAL TO OR AFFECTING THIS AGREEMENT OR THE CONDOMINIUM PROPERTY (INCLUDING THE PURCHASED UNIT).

(d)      Illinois law provides that every contract for the construction of a new home, which may or may not be the case with respect to this Agreement, carries with it a warranty that, when completed, the home will be free of latent defects and will be reasonably suited for its intended use as a home. The law further provides that this Implied Warranty of Habitability does not have to be in writing to be a part of the contract and it covers not only structural and mechanical defects such as may be found in the foundation, roof, masonry, heating, electrical and plumbing, but also any defect in workmanship which may not easily be seen or discovered upon an inspection or viewing of the property by Purchaser. Illinois law, however, also provides that a seller-builder and a purchaser may agree in writing, as here, that this Implied Warranty of Habitability is not included as a part of their particular contract.

(e)      SELLER HEREBY DISCLAIMS, AND PURCHASER HEREBY KNOWINGLY, VOLUNTARILY, FULLY AND FOREVER WAIVES, THE IMPLIED WARRANTY OF HABITABILITY DESCRIBED IN PARAGRAPH 3(d) AND ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED. PURCHASER HEREBY ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT AS A RESULT OF SUCH DISCLAIMER AND WAIVER, THE IMPLIED WARRANTY OF HABITABILITY DESCRIBED IN PARAGRAPH 3(d) IS NOT A PART OF THIS AGREEMENT AND THAT IF A DISPUTE ARISES WITH SELLER AND THE DISPUTE RESULTS IN A LAWSUIT, PURCHASER, AS A RESULT OF SUCH WAIVER AND DISCLAIMER, WILL NOT BE ABLE TO RELY ON THE IMPLIED WARRANTY OF HABITABILITY DESCRIBED IN PARAGRAPH 3(d) AS A BASIS FOR SUING SELLER OR AS THE BASIS OF A DEFENSE IF SELLER SUES PURCHASER.

3

~CHGO2:20221572.v2

I (WE), AS PURCHASER, HAVE READ AND UNDERSTAND THIS PARAGRAPH 3 AND I (WE) HAVE HAD AN OPPORTUNITY TO SEEK PROFESSIONAL ADVICE CONCERNING ITS CONTENTS AND LEGAL IMPLICATIONS, AND AFTER DOING SO, KNOWINGLY AGREE TO ITS TERMS AND THE WAIVER-DISCLAIMER OF THE IMPLIED WARRANTY OF HABITABILITY AND THE WAIVER AND EXCLUSION OF ALL WARRANTIES, EXPRESS OR IMPLIED, IN THIS PURCHASE AGREEMENT.

PURCHASER(S):

4.    **Condominium Documents.**

(a)    Prior to closing, Seller will cause the Declaration of Condominium Ownership and of Easements, Restrictions, Covenants and By-Laws for 71 East Wacker Hotel Condominium ("Condominium Declaration") to be recorded in the Office of the Recorder of Deeds of Cook County, Illinois ("Recorder's Office"). Purchaser acknowledges that Seller delivered to Purchaser prior to Purchaser's execution of this Purchase Agreement a copy of (1) the Condominium Declaration which includes a copy of the By-Laws of the Association ("By-Laws"), (2) the proposed first year's budget for the Association ("Budget"), (3) the Floor Plan of the Purchased Unit, (4) the property report ("Property Report") required by Chapter 13-72 of the Municipal Code of Chicago (the "Code") and (5) all other items required by Section 22 of the Act and Chapter 13-72 of the Code. The Condominium Declaration, By-Laws, Property Report, Budget, Floor Plans and such other documents required by Chapter 13-72 of the Code and Section 22 of the Act, as amended from time to time, are collectively called the "Condominium Documents." Purchaser acknowledges that Purchaser has had the opportunity to review the Condominium Documents. Seller reserves the right, in its sole and absolute discretion, to modify the Condominium Documents, together with the Articles of Incorporation of the Association, provided that Seller shall notify Purchaser or obtain the Purchaser's approval of any changes in the Condominium Documents and any such other documents, as the case may be, when and if such notice or approval is required by law. Purchaser agrees, from and after closing, to comply with the provisions of and perform all the obligations imposed on Purchaser as a unit owner by the Act, the Code, the Condominium Declaration and the By-Laws.

(b)    As explained in the Property Report, the Condominium is an "add-on condominium" and, as such, the Seller reserves the right to add additional property to the condominium within a specified period in the future, which can be no more than ten (10) years after the date that the condominium declaration is first recorded. The Future Expansion Phases of the Condominium may involve the addition to the Condominium on a section-by-section, floor-by-floor or other basis, sections or floors located within the Building not initially submitted to the Act, or additional new construction not originally comprising a portion of the Building. If and to the extent that the Seller elects to so add any additional floors or sections, such sections or floors, as the case may be, will be added as such sections or floors are completed and ready for conveyance to unit purchasers for occupancy. Furthermore, the Developer also reserves the right to make additional changes to the Building composition and constituent ownership components of the Building (i.e., the Condominium Property, Fitness Center, the Ballroom, the Meeting Rooms and the Restaurant contemplated for the Condominium, etc.) prior to the recordation of the Condominium Declaration.

5.    **Closing.**

(a)    The purchase and sale of the Unit Ownership shall be closed on a date ("Closing Date") which shall be the date indicated as the Closing Date in a written notice delivered by Seller to Purchaser ("Seller's Closing Notice"). Seller shall deliver to Purchaser Seller's Closing Notice at least fourteen (14) days prior to the Closing Date. Subject to Seller's Extension Right as provided below, if closing does not occur on or before June 30, 2007 (the "Anticipated Outside Closing Date") for reasons other than a delay caused by Purchaser (a "Purchaser Delay"), and Purchaser is not then in default hereunder, then upon Purchaser's written notice to Seller of its election to terminate, which must be given within ten (10) days after the Anticipated Outside Closing Date and prior to Seller's designation of the Closing Date as provided for above, Seller shall return to Purchaser the Earnest Money with any interest accrued thereon to which Purchaser is entitled pursuant to Paragraph 2 hereof, and this Purchase Agreement shall become null and void without further liability of either Purchaser or Seller. Notwithstanding the foregoing, Seller may for any reason whatsoever extend the outside closing date ("Seller's Extension Right") to a date that is up to three (3) months after the Anticipated Outside Closing Date (the "Outside Closing Date"). In order to exercise Seller's Extension Right, Seller shall deliver to Purchaser written notice of such exercise at least ten (10) days prior to the Anticipated Outside Closing Date. If Seller exercises Seller's Extension Right and closing does not occur on or before the Outside Closing Date for reasons other than Purchaser Delay, and Purchaser is not then in default

4

hereunder, then unless otherwise agreed to in writing between Seller and Purchaser, upon Purchaser's written notice to Seller of its election to terminate, which must be given within ten (10) days after the Outside Closing Date and prior to Seller's designation of the Closing Date as provided for above, Seller shall return to Purchaser the Earnest Money with any interest accrued thereon to which Purchaser is entitled pursuant to Paragraph 2, hereof, as Purchaser's sole and exclusive remedy, and this Purchase Agreement shall become null and void without further liability of either Purchaser or Seller. Any estimated date is subject to change and is specifically, subject to extension for delays occasioned by strikes, shortages of material, labor, or energy, accidents, fire or other casualties, inclement weather conditions, restrictive laws, ordinances or regulations, utility company or governmental delays or failures to act or issue approvals, acts of God and other causes beyond the reasonable control of Seller.

Notwithstanding anything to the contrary contained in this Agreement, this Agreement is contingent, at Seller's sole option, upon (a) Seller entering into binding sale/purchase agreements on or before June 30, 2006 (the "Contingency Date") for no fewer than One Hundred Fifty (150) units in the Condominium and (b) Seller obtaining financing (on terms and conditions acceptable to Seller in Seller's sole and absolute discretion) necessary for Seller's completion of the Project on or before the Contingency Date. If Seller determines, in its sole discretion, at any time prior to the Contingency Date that either condition specified in the preceding sentence will not be satisfied by the Contingency Date, Seller may, by notice to Purchaser given no later than five (5) days prior to the Contingency Date, terminate this Purchase Agreement, in which event this Purchase Agreement shall be deemed null and void in its entirety and the Earnest Money shall be returned to Purchaser.

(b)    Closing shall be effected through an escrow ("Escrow") with Chicago Title Insurance Company or another title insurance company selected by Seller ("Escrowee") in accordance with the provisions of a deed and money escrow agreement prepared by Seller with such additional revisions or provisions included as are necessary to conform to the terms and provisions of this Purchase Agreement. The Escrow shall be established on or before the Closing Date designated in Seller's notice to Purchaser. Payment of the balance of the Purchase Price and delivery of all documents required for closing hereunder shall be made through the Escrow. The cost of the Escrow shall be divided equally between Seller and Purchaser. Purchaser may use the proceeds of a money lender's escrow to pay the balance of the Purchase Price, provided that the terms of such money lender's escrow are not inconsistent with the terms of this Purchase Agreement and the Escrow. Purchaser shall bear the cost of any money lender's escrow.

(c)    At closing Seller shall deliver to Purchaser a bill of sale for the Personal Property and the FF&E, as applicable, and shall also assign to Purchaser, without recourse to Seller, any manufacturer's warranty which Seller receives covering the Personal Property.

AS TO SUCH PERSONAL PROPERTY, AND AS TO ANY CONSUMER PRODUCT (AS THAT TERM MAY BE DEFINED UNDER APPLICABLE FEDERAL, STATE, OR LOCAL LAWS) AND FF&E WHICH MAY BE CONTAINED IN THE PURCHASED UNIT, SELLER NEITHER MAKES NOR ADOPTS ANY WARRANTY WHATSOEVER AND SPECIFICALLY EXCLUDES AND DISCLAIMS EXPRESS OR IMPLIED WARRANTIES OF ANY NATURE, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(d)    At closing, Seller shall convey, or cause to be conveyed, to Purchaser or Purchaser's nominee title to the Unit Ownership by Special Warranty Deed, subject only to the following (collectively, "permitted exceptions"): (1) general real estate taxes not due and payable at the time of closing; (2) the Act; (3) the Plat and the Condominium Declaration, including all other amendments and exhibits thereto; (4) applicable zoning and building laws and ordinances and other ordinances of record; (5) encroachments, if any, which do not materially affect the use of the Purchased Unit as a hotel condominium unit; (6) leases and licenses affecting the Common Elements and the Shared Facilities Unit; (7) easements, agreements, conditions, covenants, and restrictions of record, which do not materially affect the use of the Purchased Unit as a hotel condominium unit; (8) rights of Developer, Declarant, other condominium unit owners and guests and invitees in and to the Common Elements and the Shared Facilities Unit; (9) any construction easement agreement including all amendments and exhibits thereto; (10) acts done or suffered by Purchaser or anyone claiming by, through or under Purchaser; and (11) liens and other matters of title over which Chicago Title Insurance Company or another title insurance company selected by Seller ("Title Insurer") is willing to insure at Seller's expense. If Purchaser is husband and wife, title to the Unit Ownership shall be conveyed to said persons as joint tenants with the right of survivorship, and not as tenants by the entirety or tenants in common, unless Purchaser shall otherwise direct Seller in writing not less than ten (10) days prior to the Closing Date.

(e)    Any Illinois and Cook County real estate transfer taxes shall be paid by Seller, and any City of Chicago real estate transfer tax shall be paid by Purchaser. Purchaser is obligated to pay all applicable sales and use

5

taxes with respect to the FF&E based on the purchase price of the FF&E being paid by Purchaser, as set forth on the first page of this Agreement. Seller shall pay the title insurance charges for the Owner's Policy required pursuant to Paragraph 6 hereof. Purchaser shall pay the title insurance charges for any additional title insurance and all other charges of Title Insurer, including without limitation, charges for recording Purchaser's deed and mortgage and charges for any title endorsements. Purchaser shall pay all charges, costs and expenses relating to Purchaser's mortgage financing, if any.

(f)    At closing, Seller shall furnish Purchaser a certificate of insurance for the Condominium naming Purchaser and Purchaser's mortgagee, if any, as their interests may appear, and a copy of the portions of the Plat depicting the site of the Condominium and the floor (or portion thereof) on which the Purchased Unit is located.

(g)    General real estate taxes shall be paid and prorated in the manner set forth in Exhibit C attached hereto.

(h)    The Purchaser shall pay to Seller (or, at Seller's election, to the Association) at closing an amount equal to: (1) two (2) full months' assessments for Common Expenses (as such term is defined in the Condominium Declaration) based on the last Budget included in the Property Report or adopted by the Association prior to closing, which sum, together with amounts received by Seller from other Condominium unit purchasers, shall be used to fund initial reserves or the working capital fund of the Condominium pursuant to the Condominium Declaration; and (2) two (2) full months' assessments for Shared Facilities Expenses (as such term is defined in the Condominium Declaration) based on the last Shared Facilities Budget adopted by the Developer prior to closing, which sum, together with amounts received by Seller from other Condominium unit purchasers, shall be used to fund initial Hotel Reserves (as defined in the Condominium Declaration) pursuant to the Condominium Declaration. In addition, Purchaser shall pay to Seller (or, at Seller's election as it relates to the Common Expenses, to the Association) at closing (i) Purchaser's pro rata share of the assessment for Common Expenses, Shared Facilities Expenses and Hotel Expenses (as such term is defined in the Condominium Declaration) payable for the month during which the closing occurs based on the number of days in such month falling on and after closing, (ii) the assessments for Common Expenses, Shared Facilities Expenses and Hotel Expenses payable for the first month after the month in which closing occurs and (iii) Purchaser's pro rata share of any prepaid insurance premiums applicable to the Condominium.

(i)    At closing, Seller shall deliver to Purchaser a copy of the Plat in the form attached to the Condominium Declaration for recordation.

(j)    At closing, Purchaser shall execute and deliver to Seller the form of Hotel Unit Maintenance Agreement (as defined in the Property Report) then in use by the Hotel Management Company (as such term is defined in the Property Report). Purchaser shall also execute and deliver to Seller Seller's form of acknowledgment that includes, among other things, acknowledgments by Purchaser that Purchaser's acquisition of the Purchased Unit constitutes an acquisition of an interest in real estate and that no representations have been made by Seller or any of Seller's employees, agents or representatives regarding projected or potential income or revenues to be derived from the Purchased Unit.

6.    **Title Insurance.** Purchaser hereby designates Title Insurer as the title insurance company to furnish title insurance as herein required. As a condition precedent to disbursement of sale proceeds from the Escrow, Title Insurer shall be prepared to issue its Owner's Residential Title Insurance Policy or ALTA Owners Form B Title Insurance Policy, (any such policy herein referred to as "Owner's Policy") in the amount of the Purchase Price, showing title in Purchaser or such other grantee as Purchaser shall direct pursuant to Paragraph 5(d) hereof, containing Condominium Endorsement 1, subject only to: the usual terms, conditions and exclusions contained therein and the permitted exceptions.

Such Owner's Policy shall be conclusive evidence of good title as therein shown as to all matters insured by the Owner's Policy, subject only to the exceptions as therein stated. If there are any title exceptions other than the permitted exceptions, Seller shall have thirty (30) days from the date the Escrow is established to cure or obtain title insurance over the additional exceptions, and the Closing Date shall be delayed until said exceptions are cured or insured over. If Seller fails to have the exceptions removed, or, in the alternative, to obtain at Seller's expense within said thirty (30) day period an endorsement to the Owner's Policy whereby Title Insurer insures Purchaser and its successors and grantees against any loss or damage on account of such exceptions, Purchaser may, as its sole and exclusive remedy, elect, upon written notice to Seller within ten (10) days after the expiration of said thirty (30) day period, to (i) terminate this Purchase Agreement or (ii) take title as it then is without reduction of the Purchase Price. In the absence of such written notice, Purchaser shall be deemed to have accepted the status of title and shall be obligated to close within five (5) days after the expiration of said ten (10) day period.

6

7.    **Possession and Occupancy.** Purchaser shall be entitled to occupancy and possession of the Purchased Unit from and after the closing but not prior thereto, but such possession of the Purchased Unit and any right of Purchaser to use Common Elements, the Shared Facilities Unit, the Fitness Center, the Restaurant (if any), the Ballroom (if any) and the Meeting Rooms (if any) (each such term as defined in the Condominium Documents) shall be subject to (i) Seller's right to enter into and occupy the Purchased Unit to perform any work permitted or required by this Purchase Agreement, and (ii) Purchaser's compliance with any schedule or rules and regulations established by Seller or the owner of the Restaurant, the Ballroom or the Meeting Rooms as it relates to coordinating and regulating construction, use of Building elevators, loading docks and receiving rooms and move-in by other unit purchasers and owners or occupants of the Building.

8.    **Completion of Construction and Sales Promotion.** For the purpose of completing the refurbishment and sales of the units in the Condominium, Seller and its employees, agents and contractors are hereby given the right and authority to place and maintain on, in or about the Condominium (excluding the Purchased Unit after closing) model units, offices, signs and lighting related to said construction or sales promotion purposes, for such period of time, at such locations and in such forms as shall be determined by Seller in its sole and absolute discretion. Seller, its employees, agents, contractors and prospective unit purchasers, are also hereby given, for construction and sales promotion purposes, the right of entry upon and ingress and egress to and from the Condominium (excluding the Purchased Unit after closing) and the right to restrict and regulate access to Common Elements and the Shared Facilities Unit (subject to Purchaser's reasonable access to and from the Purchased Unit) for the purposes of completing refurbishment of the Building, Common Elements, the Shared Facilities Unit or other units in the Condominium. Subject to the provisions of the Condominium Declaration concerning transient occupancy and leasing, if any, Seller may operate and make available for use as transient occupancy hotel rooms, or enter into leases for, unsold units in the Condominium upon such terms and conditions as Seller may elect, and Seller shall be responsible for and shall pay the monthly assessments on all unsold units owned by Seller until such units are sold and title to such units is conveyed.

9.    **Assignment.** This Purchase Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective heirs, devisees, personal representatives, successors and assigns, except that only permitted assigns of Purchaser shall have any rights of Purchaser hereunder. Seller may assign this Purchase Agreement without consent of Purchaser, subject, however, to Purchaser's rights under this Purchase Agreement. Purchaser may not directly or indirectly (i) assign, set over, or transfer this Purchase Agreement, or any of Purchaser's rights or interest under this Purchase Agreement, (ii) if Purchaser is a trust, partnership, corporation or limited liability company assign, set over or transfer more than ten percent (10%) of the ownership interest in such entity or (iii) list or market the Purchased Unit for sale on the MLS Listing Service, internet or any other marketing service, or otherwise advertise the sale or transfer of the Purchased Unit, without the prior written consent of Seller, which consent may be granted or withheld in the sole and absolute discretion of Seller, and any such assignment without the prior written consent of Seller shall be void and deemed a material default hereunder. Purchaser hereby represents and warrants as of the date hereof and as of the Closing Date that Purchaser is acquiring the Unit Ownership for personal use and not for resale on or prior to the Closing Date and that in acquiring the Unit Ownership the Purchaser is not acting as agent or nominee for any undisclosed party.

10.    **Broker.** Purchaser represents and warrants that Purchaser has not dealt with any broker other than Sudler and Purchaser's Broker (if any as specified on the first page of this Agreement) in connection with this sale, and agrees to indemnify and hold Seller and its agents harmless from any claim or demand asserted against Seller or its agents by any broker or finder (other than Sudler and Purchaser's Broker, if any, as provided for in an agreement with Seller regarding the Purchased Unit) alleging to have been retained in connection with this transaction. If any broker is named as Purchaser's Broker on the first page of this Purchase Agreement, Seller shall be responsible for payment of a fee or commission to such broker, but only pursuant to a written agreement between Seller and Purchaser's Broker.

11.    **Notices.** All notices, demands and requests herein required or permitted shall be in writing and shall be deemed sufficient if made by (a) personal delivery, (b) nationally recognized overnight courier service (such as FedEx), (c) facsimile (with proof of successful transmission) or (d) certified United States mail, postage prepaid, addressed:

(a)    to Seller at:

Chicago H&S Hotel Property, LLC, a Delaware limited liability company
222 Merrill Street
Suite 100

7

–CHGO2:20221572.v2

Birmingham, Michigan 48009-6147
Attn:    Mr. Geoffrey Hockman
Fax:     (248) 258-0054

and with a copy to Seller's legal counsel at the address shown in this Purchase Agreement for such counsel, and

(b)    to Purchaser at:

Purchaser's home address set forth above,

with a copy to Purchaser's legal counsel, if any, at the address shown in this Purchase Agreement for such counsel.

Any notice delivered as aforesaid shall be deemed received when delivered as it relates to personal delivery, nationally recognized overnight courier service or facsimile with proof of transmission (provided any such delivery or transmission must be received on or before 5:00 p.m. Chicago time on such date of delivery in order for such notice to be effective as of the date of delivery) and any notice mailed as aforesaid shall be deemed received three (3) business days after deposit in the United States mail. Notice of change of address for receipt of notices, demands or requests shall be sent in the manner set forth in this Paragraph 11. The provisions of this Paragraph 11 do not apply to Purchaser's right to cancel the Purchase Agreement pursuant to the Interstate Land Sales Full Disclosure Act [15 U.S.C. 1701 et seq.] as such right is set forth on the signature page of this Purchase Agreement.

12.    **Performance.**

(a)    Time is of the essence with regard to Purchaser's obligations and covenants hereunder. In the event of a default or breach of this Purchase Agreement by Purchaser, Seller may terminate this Purchase Agreement and, as its sole and exclusive remedy upon termination, retain as liquidated damages from Purchaser an amount equal to all Earnest Money paid or to be paid by Purchaser to Seller. In collecting such liquidated damages, Seller shall be entitled to retain all monies paid by Purchaser to Seller hereunder; to keep, retain, or take any security or other instrument either evidencing Purchaser's obligation to pay any sums hereunder or given by Purchaser to Seller to secure payment of such sums; and to pursue any other appropriate lawful process.

(b)    If Seller defaults on any of Seller's covenants or obligations hereunder, then Purchaser's sole and exclusive remedy, in lieu of any and all legal or equitable remedies hereunder or otherwise, shall be a refund of Purchaser's Earnest Money deposit and interest which may have accrued thereon to which Purchaser is entitled pursuant to Paragraph 2 hereof and all payments theretofore made by Purchaser. Upon refund to Purchaser of said Earnest Money and payment of interest thereon, if any, and refund to Purchaser of other amounts paid by Purchaser, this Purchase Agreement shall be thereupon null and void with no further liabilities of either party hereto.

13.    **INTENTIONALLY OMITTED.**

14.    **Material Destruction.** If, prior to closing, the Purchased Unit or a material portion of the Condominium or that part of the Building required for reasonable access to the Purchased Unit shall be destroyed or materially damaged by fire or other casualty or natural disaster, this Purchase Agreement shall, at the option of Seller exercised by notice to Purchaser within thirty (30) days after such destruction or damage, be terminated. If a Closing Date has been designated at the time such damage or destruction occurs and Seller notifies Purchaser that necessary repair or restoration cannot or will not be completed prior to the Closing Date or within ninety (90) days thereafter, Purchaser may terminate this Purchase Agreement by notice to Seller within five (5) days of Seller's notification to Purchaser. Upon such termination by Seller or Purchaser, any Earnest Money deposited hereunder with any interest accrued thereon to which Purchaser is entitled pursuant to Paragraph 2 hereof shall be refunded to Purchaser, without further liability of either party hereto. For purposes of this Paragraph 14, "material" damage is damage requiring more than $500,000.00 or ninety (90) days to repair. If, prior to closing, the Purchased Unit or any part thereof shall be destroyed or damaged by fire or other casualty or natural disaster, and this Purchase Agreement is not terminated by reason of such destruction or damage, Seller shall repair or restore the Purchased Unit and if the repair or restoration cannot be or is not completed prior to the Closing Date, then the Closing Date shall be extended to a date designated by Seller which is not less than fourteen (14) days after Seller's notice to Purchaser that the repair or restoration of the Purchased Unit is substantially completed in accordance with the Plans and Specifications for the Purchased Unit.

15.    **RESPA.** Seller and Purchaser shall comply with all of Purchaser's lender's requirements for disclosure under the Real Estate Settlement Procedures Act of 1974, as such Act may be amended from time to time.

8

~CHGO2:20221572.v2

16.    **Building Operations.**  Until such time as the owners of the units in the Condominium elect their first Board of Directors of the Association, as provided in the Condominium Declaration, Seller shall have the right to enter into or cause the Association to enter into contracts or leases for such periods of time and upon such reasonable terms as it shall deem advisable, subject to the limitations imposed by the Act and the Condominium Declaration, to provide unit owners with all necessary or convenient services, including, without limitation, hotel operation management, general management, janitor, insurance, snow removal and scavenger service. If Seller pays for any such services or advances any funds to the Association for such purposes, Seller shall be entitled to reimbursement for such amounts from the Association.

17.    **Terms.**  Wherever appropriate, as used herein, the singular denotes the plural and the masculine denotes the feminine, the neuter, or both. If Purchaser consists of more than one person or entity, then each such person or entity executing this Purchase Agreement as Purchaser shall be jointly and severally liable for the obligations of Purchaser hereunder.

18.    **Entire Agreement.**  This Purchase Agreement constitutes the entire agreement between Purchaser and Seller.  No representations, warranties, undertakings, or promises, whether oral, implied or otherwise, can be made or have been made by either Seller or Purchaser to the other unless expressly stated herein or unless mutually agreed to in writing by the parties hereto. This Purchase Agreement may not be amended except in a writing signed by both parties.  All agreements, representations and warranties made herein shall survive the closing of this transaction.

19.    **Severability.**  The invalidity of any agreement, restriction, condition, reservation or any other provision of this Purchase Agreement shall not impair or affect in any manner the validity, enforceability or effect of the rest of this Purchase Agreement.

20.    **No Reservation.**  The submission by Seller of this Purchase Agreement to a prospective purchaser for examination does not constitute an offer by Seller to sell, or a reservation of or option for any unit in the Condominium. This instrument shall not become a contract until executed and delivered by Purchaser and Seller.

21.    **Seller.**  If this Purchase Agreement is executed by Seller's agent, such agent represents that it is authorized to execute and deliver this Purchase Agreement on behalf of Seller.  The liability of Seller under this Purchase Agreement or any amendment, or any instrument or document executed in connection with this Purchase Agreement shall be limited to and enforceable solely against the assets of Seller constituting an interest in the Condominium and not other assets of Seller. Assets of Seller, if it is a partnership, do not include the assets of the partners of such partnership, and a negative capital account of a partner in a partnership and an obligation of a partner to contribute capital to the partnership shall not be deemed to be assets of the partnership which is Seller. No directors, officers, employees or shareholders of any corporation or members of any limited liability company which may at any time be Seller or a partner of Seller shall have any personal liability arising from or in connection with this Purchase Agreement.

22.    **Exhibits.**  Exhibits A, B and C and any Riders attached hereto are incorporated herein and made a part hereof. In the event of any conflict between the provisions of this Agreement and the provisions of any Rider, the provisions of the Rider shall control.

23.    **Attorney Review.**  This Agreement is subject to the reasonable review and approval as to its form (other than dates, the Purchase Price and the amount of Earnest Money) by Purchaser's attorney within five (5) business days after Seller's acceptance of this Agreement. If written notice of disapproval is received by Seller from Purchaser or Purchaser's attorney within such time period (which notice must include all suggested modifications to the Agreement form articulated in detail, if any), then this Agreement shall be deemed null and void and the Earnest Money and any other amounts paid by Purchaser to Seller shall be returned to Purchaser.  If no written notice of disapproval is received by Seller within such time period, then this contingency shall be deemed waived and this Agreement shall remain in full force and effect.

24.    **Right of Repurchase.**

(a)    In the event Purchaser desires to sell or proposes to close the sale of the Unit Ownership within one (1) year after the Closing Date, Purchaser hereby grants Seller a right to repurchase the Property on the terms and conditions hereinafter set forth.  Purchaser shall notify Seller in writing not less than forty-five (45) days prior to the closing of such a proposed sale, which notice shall contain the name and address of the proposed purchaser and shall contain a copy of the proposed contract of sale including the terms and conditions of sale.  Seller shall have the right to repurchase the Property, which right shall be

9

exercised by written notice to Purchaser within thirty (30) days after receipt of said notice from Purchaser, on the following terms: (i) the price shall be the Repurchase Price (as hereinafter defined) plus or minus prorations of general real estate taxes, prepaid insurance premiums, utility charges, monthly assessments, monthly Hotel Expenses, monthly Shared Facilities Expenses and other similar proratable items; (ii) Purchaser shall convey good and marketable title to the Unit Ownership by special warranty deed to Seller or its designee, and the Personal Property by bill of sale with warranties of title, subject only to those permitted exceptions (excluding acts of Purchaser) existing at closing and any acts of Seller; (iii) closing of the repurchase shall be effected through an escrow similar to that described in Paragraph 5(b) hereof; (iv) Purchaser shall bear all costs of the escrow and title insurance in the amount of the Repurchase Price; and (v) any Illinois and Cook County transfer taxes shall be paid by Purchaser, and any City of Chicago real estate transaction tax shall be paid by Seller.  The Repurchase Price shall be the Purchase Price set forth in Paragraph 1 hereof.  If Seller notifies Purchaser within said thirty (30) day period of its election to repurchase the Property, then such repurchase shall be closed and possession delivered to Seller within thirty (30) days after the giving of Seller's notice of such election.  In the event of Seller's repurchase of the Property as provided herein, Purchaser agrees to reconvey the Purchased Unit and Personal Property to Seller in the same physical condition as at closing, except for ordinary wear and tear.

(b)    If Seller gives written notice to Purchaser within said thirty (30) day period that it does not elect to exercise said repurchase right, or if Seller fails to give written notice to Purchaser during the thirty (30) day period, then Purchaser may proceed to close the proposed sale; provided, however, that if Purchaser fails to close the proposed sale with the proposed purchaser at the purchase price and on the other terms and conditions contained in the aforesaid notice, the right of repurchase granted to Seller herein shall remain in effect and shall be applicable to any subsequent proposed sale by Purchaser of the Unit Ownership within the remainder of the said one-year period.  If Purchaser so proceeds to close the proposed sale as aforesaid, upon Purchaser's written request Seller will execute and deliver to Purchaser a release of Seller's rights under this Paragraph 24, which delivery may be conditioned upon closing of such sale.

(c)    Any sale or purported sale of the Unit Ownership in violation of the provisions of this Paragraph 24 shall be null and void and of no force and effect.  The deed to be delivered by Seller on the Closing Date shall contain provisions incorporating the foregoing right of repurchase, and stipulating that it binds the grantee under the deed and its successors and assigns by acceptance of a deed.

(d)    For purposes of this Paragraph 24 "sell" or "sale" means:  any sale, transfer or other voluntary conveyance of the Unit Ownership; lease with an option to purchase the Unit Ownership; any assignment (except for collateral purposes only) of all or any portion of the beneficial interest or power of direction under any trust which owns legal or beneficial title to the Unit Ownership for consideration; or sale or transfer of substantially all of the stock, partnership or membership interests of a corporation, partnership or limited liability company which owns legal or beneficial title to the Unit Ownership.

(e)    Seller's right of repurchase under this Paragraph 24 shall be subordinate to the rights of the holder of any mortgage or trust deed hereafter placed upon the Unit Ownership.

(f)    Seller agrees to release its right of repurchase under this Paragraph 24 at any time upon Purchaser's written request following the sale and closing of all units in the Condominium of similar area or same number of bedrooms as the Purchased Unit.

25.    **General.**

(a)    **Definition of Terms.**  The terms used herein, to the extent they are defined in the Condominium Declaration, shall be defined as set forth therein.  Wherever appropriate, as used herein, the singular denotes the plural and the masculine denotes the feminine, the neuter, or both.

(b)    **More than One Purchaser.**  If Purchaser consists of more than one person or entity, each such person or entity shall be jointly and severally liable for the obligations of Purchaser under this Agreement.  Any notice required or permitted hereunder given by Seller to any one of the parties constituting Purchaser or given by any one of the parties constituting Purchaser to Seller, shall, for all purposes hereunder, be deemed sufficient service of notice and shall be binding, jointly and severally, upon all such parties constituting Purchaser.

10

**PURCHASER:**

Date of Purchaser's offer:

_____8 / 26_____, 20 _05_.

**SELLER:**

**CHICAGO H&S HOTEL PROPERTY, LLC,** a Delaware limited liability company

By:_____

Name:_____

Its:_____

Date of Seller's acceptance and date of this Purchase Agreement:

_____, 20 ____.

**SELLER'S ATTORNEYS:**
**DLA PIPER RUDNICK GRAY CARY US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Attention: Adam T. Berkoff, Esq.
Phone:  (312) 368-7266
Fax:    (312) 630-5331
E-Mail: adam.berkoff@DLApiper.com

11

~CHGO2:20221572.v2

### 71 EAST WACKER HOTEL CONDOMINIUM

**71 East Wacker Drive
Chicago, Illinois 60601**

The undersigned hereby acknowledges receipt of the Property Report for 71 East Wacker Hotel Condominium and that the undersigned has had an opportunity to review this Property Report.

**PLEASE PRINT:**

NAME:_____

ADDRESS:_____ APT. _____

CITY:_____ STATE:_____ ZIP:_____

SIGNATURE:_____

DATE:_____

~CHGO2:20217704.v2

# EXHIBIT D

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

   CORDES & COMPANY, LLC, a          )
4  Delaware limited liability        )
   company, as Receiver, et al.,     )
5                                    )
                    Plaintiffs,      )
6  -vs-                              )   Case No. 07 C 3526
                                     )
7  CHICAGO H&S HOTEL PROPERTY,       )   Chicago, Illinois
   LLC, a Delaware limited           )   August 8, 2007
8  liability company; MITCHELL       )   9:45 a.m.
   COMPANIES, LLC, a Florida         )
9  limited liability company;        )
   CHICAGO TITLE AND TRUST           )
10 COMPANY, an Illinois              )
   corporation; THE FORMULA,         )
11 INC., a Florida corporation;      )
   and THE FALOR COMPANIES, INC.,    )
12 an Illinois corporation,          )
                                     )
13                  Defendants.      )

14

15                TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE RUBEN CASTILLO

16 APPEARANCES:

17 For the Plaintiffs:        MR. JOHN L. KRENN
                              Gray, Plant, Mooty, Mooty & Bennett
18                            500 IDS Center
                              80 South Eighth Street
19                            Minneapolis, MN  55402
                              (612) 632-2222
20

21 Court Reporter:

22                KATHLEEN M. FENNELL, CSR, RMR, FCRR
                       Official Court Reporter
23                   United States District Court
               219 South Dearborn Street, Suite 2144-A
24                    Chicago, Illinois  60604
                    Telephone:  (312) 435-5569
25            email:  Kathyfennell@sbcglobal.net

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiffs:        MR. MARK E. LEIPOLD
                                Gould & Ratner
 3                              222 North LaSalle Street
                                Suite 800
 4                              Chicago, Illinois  60601
                                (312) 236-3003
 5

 6

     For Defendant H&S:         MR. RAFEY SARKIS BALABANIAN
 7                              Cohon, Raizes & Regal, LLP
                                208 South LaSalle Street
 8                              Suite 1860
                                Chicago, Illinois  60604
 9                              (312) 726-2252

10

     For Defendant Mitchell
11   Companies, LLC:            MR. CHARLES J. RISCH
                                Lawrence, Kamin, Saunders & Uhlenhop
12                              300 South Wacker Drive
                                Suite 500
13                              Chicago, Illinois  60606
                                (312) 372-1947
14
     For Defendant Chicago
15   Title and Trust Company:   MS. PAULA S. KIM
                                Katten Muchin Rosenman, LLP
16                              525 West Monroe Street
                                Chicago, Illinois  60661
17                              (312) 902-5563

18   For Defendant The
     Formula, Inc.:             MR. DANIEL M. FEENEY
19                              Miler Shakman & Beem LLP
                                180 North LaSalle Street
20                              Suite 3600
                                Chicago, Illinois  60601
21                              (312) 263-3270

22

23

24

25
```

1    (Proceedings heard in open court:)

2              THE CLERK:   07 C 3526, Cordes versus Chicago H&S

3    Hotel.

4              THE COURT:   Good morning.

5              MR. KRENN:   Good morning, your Honor.   John Krenn

6    and Mark Leipold here on behalf of the court-appointed

7    receiver appointed by a Hennepin County court in the state of

8    Minnesota.

9              MR. RISCH:   Good morning, your Honor.   Charlie

10   Risch on behalf of the defendant, the Mitchell Companies.

11             MR. FEENEY:   Good morning, your Honor.   Dan Feeney

12   on behalf of defendant The Formula, Inc.

13             THE COURT:   Okay.

14             MS. KIM:   Paula Kim for defendant Chicago Title and

15   Trust Company.

16             MR. BALABANIAN:   And Rafey Balabanian for defendant

17   Chicago H&S Hotel Property.

18             THE COURT:   Okay.   I did read the status report,

19   and I thank you for filing that.

20             MR. KRENN:   Your Honor, we've been working the last

21   month since the hearing before the Court on the preliminary

22   injunction motion in which the Court froze the assets that

23   were at Chicago Title.   That's about $2.5 million.

24             There's two halves to this case, and we've been

25   working to solve one-half of that case based on the Court's

1    request at the last hearing.  Unfortunately, we have not been

2    able to resolve that issue, and what we've got is --

3              THE COURT:  To free up these funds?

4              MR. KRENN:  The 2.5 million that is at Chicago

5    Title, it's an escrow account.  It came as part of down

6    payments for the Hotel 71 property.  It's no longer possible

7    for those -- the Hotel 71 property to -- for those units to

8    close.  As a result, this money is sitting here.  We'd like

9    to get it back to Minnesota where the receiver -- put it in

10   the receivership proceeding in Minnesota and distribute it

11   appropriately to the investors, and we have not been able to

12   get that done.

13             We have had discussions about interpleader with the

14   idea of Chicago Title interpleading the money here and then

15   you transferring the money to the Minnesota court for

16   resolution.  That's one option that we've discussed.  Another

17   option is simply for that money to be ordered by the Court to

18   the Minnesota receiver.

19             It just makes an awful lot of sense, your Honor.

20   There's a hundred investors or more in Minnesota that would

21   potentially have claims to this money.  Some of the

22   discussions we've had in the last week have suggested that

23   maybe those -- all those people need to be joined to this

24   action and bring a hundred Minnesota people out here.

25   That --

1     THE COURT:  Doesn't make sense to me.

2     MR. KRENN:  From the receiver's standpoint, it made

3   no sense at all, your Honor, and one of the things that we

4   would simply like to have done is an interpleader by Chicago

5   Title.  The money is here in the court, the court transfers

6   it to Minnesota, and we proceed from there.

7     THE COURT:  You're making this by way of an oral

8   motion?

9     MR. KRENN:  Your Honor, it's not an oral motion.

10   It's really -- we've been working hard on this.  We've had

11   two discussions --

12     THE COURT:  Well, wait, wait, wait.  You're making

13   this by way of an oral motion.

14     MR. KRENN:  Your Honor, you -- what we're

15   looking --

16     THE COURT:  Wait, counsel.

17     MR. KRENN:  We're looking for --

18     THE COURT:  That's a yes or no question.

19     MR. KRENN:  Your Honor, we're looking --

20     THE COURT:  It's an oral motion.

21     MR. KRENN:  I believe, your Honor, that you --

22     THE COURT:  Wow, I can't even get an answer to

23   this.

24     MR. KRENN:  Your Honor, I would say yes.

25     THE COURT:  "I would say yes," that's the best you

1   can do as an attorney?  "I would say yes"?

2          MR. KRENN:  I'm sorry, your Honor.  The -- we were

3   looking for a little guidance from the Court here

4   because the --

5          THE COURT:  No, all I want is a straight answer,

6   and I can't even get that.

7          MR. KRENN:  Your Honor, I apologize.

8          THE COURT:  You're making an oral motion to

9   interplead this money.

10          MR. KRENN:  Your Honor, actually I cannot -- I

11   would say, frankly, your Honor, the answer to your question

12   is no because I am not capable of interpleading the money.

13   It's not my money to interplead.  I was suggesting a way out

14   of this mess that we're in right now.  So, your Honor, it is

15   not an oral motion.  I apologize for miss --

16          THE COURT:  I just want, you know, a straight

17   answer.  I don't think it's too much to ask.

18          What's the other parties' views?

19          MR. BALABANIAN:  Your Honor, if I may, Rafey

20   Balabanian for Chicago H&S.  Judge, we have been trying to

21   work out this issue for the past couple of weeks, and there's

22   one -- there's a couple points that make my client extremely

23   uncomfortable and really it's about being sued two or three

24   times for these escrow funds, Judge.

25          Not only are -- potentially do we have about a

1   hundred people in Minnesota who may have claims to this

2   money, Judge, but we also have other people outside of that.

3   From my client's perspective, it -- the numbers, the

4   $2.5 million really correspond to 43 purchasers of hotel

5   condominiums which never closed, Judge.

6            And so basically from my client's perspective, it's

7   simply a case where if we don't join perhaps all of the

8   parties in Minnesota or these other 43 purchasers who also

9   might have claims to this money, my client's left out there

10  to wonder whether or not it's going to be sued down the road

11  for the same money.

12           There's no question that my client has no right to

13  retain this money in the end, Judge, but the point is is who

14  does the money go to?  And there's got to be, from my

15  client's perspective, cover to know that we're not going to

16  be sued in the future, and I don't know if that means joining

17  all the people in Minnesota or joining all the people -- the

18  43 purchasers.  I don't even know if that's possible.  These

19  might be indispensable parties under Rule 19, but to simply

20  say that the Court -- well, just to simply settle it and

21  interplead the money, Judge, I don't think provides my client

22  with sufficient cover in this situation, and that's really

23  what I'm looking to preserve.

24           MS. KIM:  Your Honor, defendant -- Paula Kim for

25  Chicago Title & Trust.  As the escrow trustees, we would like

1    to echo what Rafey has said on behalf of Chicago H&S.  Again,

2    we'd like to emphasize we also would like to be protected

3    from liability, from being sued by other third parties if we

4    did bring an interpleading action.

5              So I think at this point, the parties are just

6    trying to figure out procedurally how we would be able to do

7    this.

8              THE COURT:  It would seem to me to be an agreed

9    transfer of this money to the Minnesota court would be the

10   way to go.  You're protected by the proceedings that are

11   occurring in Minnesota, whereby a judge apparently has

12   appointed a receiver to collect this money.  You've now

13   acknowledged here in open court that you don't have a right

14   to retain this money.  I think that's what you should be

15   concerned about, but I can't solve this issue for you just

16   magically on a motion call in this manner.

17             MR. KRENN:  I understand that, your Honor.  The

18   concern that they're raising about service, we are here in --

19   as a representative of the Hennepin County district court and

20   with the idea of getting this money back to these investors,

21   and so the concern about them being subject to double

22   liability, that can be taken care of by the controls through

23   the Hennepin County court, through your Honor, and through

24   whatever judge sees some other case come in the door.  The

25   receiver has --

1          THE COURT:  I agree with that.  Well, where does

2     that leave us?

3          MR. KRENN:  Well, your Honor, I will continue to

4     talk to counsel here.

5          THE COURT:  Let me also do this then because you

6     seem to be unable to resolve this.  I've tried to give you

7     some time to do this.

8          I'm going to refer this to Magistrate Judge Denlow

9     to have an expedited settlement conference, and hopefully he

10    can get to you so that you can resolve this, and maybe he can

11    assist you in doing that.

12         In the meantime, I will set a status for

13    September 6th at 9:45.  If you do reach some type of agreed

14    order, which I think is what you need to transfer this money

15    to Minnesota and you want to submit it to my chambers, you're

16    free to do that.

17         Thank you.

18         MR. KRENN:  Your Honor, there's one other item.

19    This -- what we've been talking about is one-half of the

20    case.  With respect to the other half of the case, we would

21    like to commence discovery.

22         THE COURT:  You're free to commence discovery.

23         MR. KRENN:  Thank you, your Honor.

24         THE COURT:  Thank you.

25         THE CLERK:  03 --

1          MR. RISCH: Your Honor, excuse me, as the defendant

2    in the other half of the case, there's some provision in

3    this, are we entering the suggested discovery schedule here

4    or are we just --

5          THE COURT: No.

6          MR. RISCH: Take care of that later?

7          THE COURT: At this point, you're free to commence

8    discovery. I haven't done anything other than what I've

9    indicated.

10          MR. RISCH: Great. Thank you very much.

11          THE COURT: Thank you.

12          MS. KIM: I have courtesy copies of our answer --

13          THE COURT: Of what?

14          MS. KIM: Courtesy copies of our answer that we

15    filed yesterday, just bring those to you.

16      (Which were all the proceedings heard.)

17                    CERTIFICATE

18     I certify that the foregoing is a correct transcript

19    from the record of proceedings in the above-entitled matter.

20

21    _____       8-29-07

      Kathleen M. Fennell         Date

22    Official Court Reporter

23

24

25